**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Civil Action No. 15-1631 (RDM) |
| LEN BLAVATNIK, | |
| *Defendant*. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the Government's Motion for Entry of Final Judgment. Dkt. 1-4. The United States and Defendant Len Blavatnik have stipulated to entry of a Final Judgment providing for the payment of a civil penalty of $656,000 by Defendant pursuant to Section 7A(g)(1) of the Clayton Act, 15 U.S.C. § 18a(g)(1), the premerger notification provision of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"). Dkts. 1-2, 1-3. In its motion, the Government asserts that the procedures for reviewing proposed consent judgments under the Antitrust Procedures and Penalties Act of 1974 ("APPA"), also known as the Tunney Act, 15 U.S.C. § 16(b)–(h), do not apply to this case because the proposed consent judgment seeks only monetary penalties, rather than injunctive relief. Dkt. 1-4 at 3. On October 19, 2015, the Court ordered supplemental briefing regarding whether the Tunney Act is indeed inapplicable, Dkt. 2, as the Government's motion included only a single paragraph on the matter, Dkt. 1-4 at 3, and no case law addresses the issue in any depth. In light of the apparent agreement of the Government and Defendant that the Tunney Act is inapplicable, the Court's October 19, 2015 Order invited interested *amici*, if any, to file briefs addressing the matter. Dkt. 2 at 3. The Government filed a supplemental brief further elucidating its position on November

20, 2015, Dkt. 3, with which Defendant Blavatnik summarily concurred, Dkt. 4.  No *amicus* briefs were filed.  The Court heard oral argument on the issue on February 3, 2016.

Although the Court recognizes that the Justice Department's reading of the Act is supported by 40 years of consistent practice, the Court cannot reconcile that practice or the Government's position in this case with the plain language of the Tunney Act, which applies to "*any* proposal for a *consent judgment* submitted by the United States" and not merely to proposed injunctive decrees.  15 U.S.C. § 16(b) (emphasis added).  The Court is also unconvinced that either the legislative history of the Tunney Act or any subsequent congressional action provides a basis to depart from—or to assign a unique meaning to—that plain language.  Because the Tunney Act procedures, accordingly, must be followed in this case, and because the Government has yet to comply with those procedures, the Court **DENIES** the Government's Motion for Entry of Final Judgment (Dkt. 1-4) without prejudice.

## I.  BACKGROUND

Congress enacted the Tunney Act against the backdrop of a long history of concern about the Justice Department's process for settling antitrust cases.  In 1959, the Antitrust Subcommittee of the House Committee on the Judiciary issued a report on the settlement of antitrust enforcement matters.  *See* Antitrust Subcomm., H.R. Comm. on the Judiciary, 86th Cong., 1st Sess., *Rep. on the Consent Decree Program of the Dep't of Justice* (Comm. Print 1959) ("1959 Report").[1]  The report explained that the Subcommittee had received complaints "that consent decrees . . . eliminated the judiciary from enforcement of the antitrust laws;" that they deprived private litigants of the ability to benefit from the Government's prosecution of

---

[1]   *Available at* http://catalog.hathitrust.org/Record/011396134.

antitrust litigation in the form of follow-on actions for treble damages; that they were negotiated in secret, without input from competitors who "might be adversely affected;" and that they "often deprived the Government of relief it could have obtained if it had litigated its case." *Id.* at x.  The Subcommittee assembled case studies of prominent antitrust "consent decrees" and concluded that the Justice Department had been too solicitous of the defendants' interests and had "abdicate[d] [its] duty" to ensure that settlements served the public interest, *id.* at 293; *see also id.* at 296–97, that decrees improperly left monopolies intact, *id.* at 290, that the Department demonstrated a "lack of candor" by not sharing information about settlements with the Subcommittee and the public, *id.* at 292; *see also id.* at 304, and that the Department had failed to require compliance with consent decrees, *id.* at 294, 302.

The Subcommittee, as a result, recommended that the Department of Justice revise its antitrust settlement procedures.  *Id.* at 304.  In particular, the Subcommittee urged the Department to "devise procedures which would assure competitors of the defendants a greater participation in the preparation of the terms of a consent decree than is now provided by the sporadic discussions which the Department of Justice on occasion initiates."  *Id.*  Under those procedures, as contemplated by the Subcommittee, the Department would "provide notice to the public of the terms of the consent decree, and establish a waiting period" during which "private parties, who may be affected by the terms of the decree, should be given an opportunity to intervene in the Government's case in order to present their objections to the court for its consideration."  *Id.*  Moreover, "[w]hen the Department of Justice presents a consent decree to the court for its approval, it should be accompanied by a statement that sets forth the facts involved, the defendant's position, the meaning of the provisions used in the decree, and the reasons that form the basis for the Department's acceptance of the particular compromise."  *Id.*

The Subcommittee resolved to give the Attorney General the opportunity to "accomplish this revision through changes in the rules that govern the administration of his Department," but cautioned that, should he decline to act "or if the changes he institutes are inadequate, Congress should, by legislation, establish mandatory procedures and standards of conduct for this area." *Id.*

The Justice Department responded in July 1961, when then-Attorney General Robert Kennedy issued an administrative order entitled "Consent Judgment Policy." 28 C.F.R. § 50.1 (1970). That order established a "policy" that the Department would "consent to a proposed judgment in an action to prevent or restrain violations of the antitrust laws only after or on condition that an opportunity is afforded persons (natural or corporate) who may be affected by such judgment and who are not named as parties to the action to state comments, views or relevant allegations prior to entry of such proposed judgment by the court." *Id.* § 50.1(a). "Pursuant to this policy," the order further provided that proposed antitrust consent judgments would "be filed in court or otherwise made available upon request to interested persons . . . at least 30 days prior to entry by the court," and that the Department would "receive and consider any written comments, views or relevant allegations relating to the proposed judgment" before entry of the judgment. *Id.* § 50.1(b). The Department reserved discretion to decide whether to disclose comments and "reserve[d] the right" (1) to disavow the proposed consent judgment if new facts or considerations came to light in the comment process and (2) "to object to intervention by any party not named as a party by the Government." *Id.* The Department also adopted other reforms through less formal means, but abandoned them shortly thereafter. *See* Note, *The* ITT *Dividend: Reform of Department of Justice Consent Decree Procedures*, 73 Colum. L. Rev. 594, 607–609 (1973) (discussing the use of settlement clauses providing that the

settlement would have *prima facie* effect in a treble damages action and pre-filing negotiation practices).

The Department's antitrust settlement authority was once again subject to scrutiny when "the details of the [International Telephone & Telegraph Corporation ("ITT")] antitrust settlement bec[a]me public in [the] Spring [of] 1972." *Id.* at 603. The Justice Department's settlement with ITT permitted "the nation's ninth largest corporation" to merge with Hartford Fire Insurance "in exchange for divesting itself of several smaller subsidiaries." *Id.* at 603–04. Senate confirmation hearings for Attorney General Richard G. Kleindienst probed the ITT settlement and suggested a connection between ITT's contributions to the 1972 Republican National Convention and the Nixon administration's willingness to settle on terms unduly favorable to ITT, but Kleindienst denied any White House involvement in the matter. *Id.* at 604; 120 Cong. Rec. 29,269–70 (1974). The Watergate tapes revealed, however, that President Nixon had indeed told then-Deputy Attorney General Kleindienst that he did not want an ITT prosecution. *See* Ciara Torres-Spelliscy, Brennan Ctr. for Justice, *The I.T.T. Affair and Why Public Financing Matters for Political Conventions* (Mar. 19, 2014).[2] As a result, President Nixon's "unlawful activities . . . relating to the confirmation of Richard Kleindienst as Attorney General of the United States" were included in the Articles of Impeachment adopted by the House Judiciary Committee. 120 Cong. Rec. at 29,268 (1974). Attorney General Kleindienst also ultimately pleaded guilty in 1974 to a charge of failing to testify "accurately and fully" at his confirmation hearings about White House involvement in the ITT case. *See* Torres-Spelliscy, *supra*.

---

[2] *Available at* https://www.brennancenter.org/blog/itt-affair-why-public-financing-matters-political-conventions.

The ITT scandal was a major impetus for the passage of the Tunney Act.  *See* 120 Cong. Rec. 38,585 (1974) (statement of Sen. Tunney); *see also* 120 Cong. Rec. 36,342 (1974) (statement of Rep. Holtzman); *The* ITT *Dividend*, *supra*, at 626–34.  The Act applies to "[a]ny proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws."  18 U.S.C. § 16(b).  First, the Act provides for disclosure of certain information pertaining to the settlement and for an opportunity for public comment.  It requires that the Government file a proposed "consent judgment" with "the district court . . . and publish[] [it] . . . in the Federal Register at least 60 days prior to the effective date of such judgment;" that any written comments and responses to them also be filed and published within 60 days; that materials "considered determinative in formulating" the proposed judgment be made publicly available; that the Government, "unless otherwise instructed by the court," file with the court and publish in the Federal Register a competitive impact statement reciting various information about the proposal, *id.*; and that a summary of the proposal and the competitive impact statement be published in specified newspapers, *id.* § 16(c).  The Act also requires the defendant to disclose to the court any lobbying contacts with the government—that is, "any and all written or oral communications by or on behalf of such defendant . . . with any officer or employee of the United States concerning or relevant to such proposal."  *Id.* § 16(g).  In addition, it requires that the Attorney General "receive and consider any written comments" and, at the close of the 60-day period, publish a response to them.  *Id.* § 16(d).  Finally, the court must ultimately "determine that the entry of such judgment is in the public interest" before entering the proposed consent judgment, and the Act provides procedures for making that determination.  *Id.* § 16(e)–(f).

Just two years after enacting the Tunney Act, Congress enacted the Hart-Scott-Rodino Act. As relevant here, the HSR Act requires notification to the Department of Justice and the Federal Trade Commission ("FTC") and observation of a waiting period before a person completes certain acquisitions of voting securities or assets. 15 U.S.C. § 18a(a). The Act also exempts an array of transactions, including the acquisition of voting securities "solely for the purpose of investment." *Id.* at § 18a(c)(9). This premerger notification requirement facilitates the agencies' ability to detect and prevent antitrust violations before they occur. *See, e.g.*, *id.* § 18a(f) (providing procedures for obtaining a preliminary injunction against consummation of a proposed acquisition that would violate the Clayton Act, the Federal Trade Commission Act, or the Sherman Act). Violations of the HSR Act are punishable by a civil penalty of not more than $16,000 per day. *Id.* § 18a(g)(1); Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, § 31001(s), 110 Stat. 1321, 1321-373 (amending the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note); 16 C.F.R. § 1.98(a). Violations of the notification requirement are also subject to "such other equitable relief as the court in its discretion determines necessary or appropriate." 15 U.S.C. § 18a(g)(2)(C).

## II. ANALYSIS

The Government and Defendant Blavatnik assert that the proposed consent judgment in this case is not subject to Tunney Act procedures because an HSR Act settlement solely for a civil penalty is not a "proposed consent judgment" within the meaning of the Tunney Act. *See* Dkts. 3–4. According to the Government, the Tunney Act applies to settlements seeking equitable relief and not to those seeking only monetary penalties. Dkt. 3 at 2. Thus, under the Government's theory, HSR Act settlements for injunctive relief are subject to the Tunney Act, while HSR Act settlements for monetary penalties are not. *Id.* at 13 n.4. In the Government's

view, "[a]pplication of Tunney Act procedures to settlements for exclusively legal relief such as monetary penalties is inconsistent with the statute's history, its language as a whole, and nearly four decades of precedent." *Id.* at 2.  It further contends that Congress has "implicitly ratified" its position. *Id.*

## A.  The Text

In order to determine whether the Tunney Act applies to proposed settlements for civil penalties, the Court "begin[s] with the text of the statute." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011).  The Act applies to "[a]ny proposal for a *consent judgment* submitted by the United States for entry in *any civil proceeding* brought by or on behalf of the United States *under the antitrust laws*."  15 U.S.C. § 16(b) (emphases added).  The Court can easily dispose of two issues.  First, there can be no reasonable dispute that an HSR Act civil penalty action arises "under the antitrust laws."  Although enacted after the original Clayton Act of 1914 (as well as the Tunney Act), the relevant portions of the HSR Act were inserted into the Clayton Act.  *See* Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, § 201, 90 Stat. 1383, 1390 (amending the Clayton Act by inserting § 7A); *see also* Dkt. 1 at 2 (Government's complaint referring to HSR premerger notification provisions as "Section 7A(g) of the Clayton Act").  The Clayton Act, in turn, defines "antitrust laws" to include, among other statutes, the Clayton Act itself.  15 U.S.C. § 12(a).  Second, although civil penalties are punitive in nature, this is undoubtedly a "civil proceeding."  The Government does not contest either of these propositions.

The dispositive question is thus whether a proposed judgment for civil penalties entered pursuant to a settlement between the parties is a "consent judgment" within the meaning of the Tunney Act.  As a matter of common usage, it is difficult to avoid the conclusion that the answer

is not merely yes, but that it is tautologically so.  A "consent judgment" is, by definition, a judgment to which the parties have agreed.  Black's Law Dictionary observes that a "consent judgment" is synonymous with an "agreed judgment," which is "[a] settlement that becomes a court judgment when the judge sanctions it.  In effect, an agreed judgment is merely a contract acknowledged in open court and ordered to be recorded, but it binds the parties as fully as other judgments."  *Agreed Judgment*, *Consent Judgment*, Black's Law Dictionary (10th ed. 2014).  The Merriam-Webster Dictionary similarly defines a "consent judgment" as "a judgment by a court exercising common-law jurisdiction entered by consent of the parties upon stipulation or agreement."  *Consent Judgment*, Webster's Third New Int'l Dictionary, Unabridged (2016).  The surrounding language of the Tunney Act, moreover, confirms the law's expansive reach and the absence of a carve-out for particular types of "consent judgments."  It applies to "*any* proposal for a consent judgment . . . in *any* civil proceeding."  15 U.S.C. § 16(b) (emphases added).  Thus, as a matter of ordinary meaning, it is difficult to escape the conclusion that the Act applies to *all* proposed Department of Justice antitrust consent judgments—whether for equitable or monetary relief.

The Government does not agree.  Instead, it contends that the phrase "consent judgment" has long been understood in antitrust law to refer only to settlements for equitable relief.  In support of this position, the Government asserted at oral argument that it has been unable to locate any pre-Tunney Act case that used the phrase "consent judgment" to refer to a purely monetary judgment in an antitrust enforcement action.  To this, it added that the 1961 Attorney General policy statement was captioned "Consent Judgment Policy," but expressly applied only to actions "to prevent or restrain violations of the antitrust laws."  28 C.F.R. § 50.1(a) (1970).  According to the Government, the latter phrase—"to prevent or restrain"—is a technical term

that is used in § 4 of the Sherman Act and § 15 of the Clayton Act to refer to the courts'
equitable powers to enjoin actions in violation of the substantive antitrust laws. *See* 15 U.S.C. §§
4, 25. That contention, indeed, finds support in the text of § 4 of the Sherman Act and § 15 of
the Clayton Act, which provide that "it shall be the duty of the several United States attorneys
. . . to institute proceedings in *equity* to prevent and restrain" violations of those statutes. *Id.*
(emphasis added).

The problem with the Government's argument is that it essentially skips over the
question of the plain meaning of the Tunney Act and argues, instead, that the Department's pre-
Tunney Act practice shows that Congress did not intend to reach purely monetary awards. As
the Government explained at oral argument, the only civil penalty actions for monetary relief
authorized before the HSR Act was enacted were actions brought under the Federal Trade
Commission Act ("FTCA") for violations of FTC orders. *See id.* § 21(l); *see also id.* § 15a
(authorizing damages suits by United States). All other antitrust suits by the United States
involved claims for equitable relief under the Sherman and Clayton Acts. It is thus unsurprising
that the Government has been unable to locate any pre-Tunney Act cases in which the phrase
"consent judgment" was used to refer to purely monetary settlements. Indeed, as the
Government conceded at oral argument, it was also unable to locate any case involving a purely
monetary settlement that used a phrase other than "consent judgment" to refer to a court-
approved settlement. In short, the Government found evidence that the label "consent judgment"
was used to refer to injunctive settlements, but no evidence—one way or the other—about
whether the label also applied to court-ordered monetary settlements. Similarly, the fact that the
Attorney General's "Consent Judgment Policy" applied to actions "to prevent or restrain
violations of the antitrust laws" may indicate that in 1961 the Department was focused on

enforcement of the Sherman and Clayton Acts, as they then existed, but it says little, if anything, about the plain meaning of the phrase "consent judgment" in the Tunney Act.

The Government's contention that the phrase "consent judgment" can be construed to exclude monetary judgments would have greater purchase if the Tunney Act used the phrase "consent decree," because that term has sometimes been used to connote purely equitable relief. *See Decree*, Black's Law Dictionary (10th ed. 2014) ("'The chief differences between decrees in equity and judgments at common law are [that] [t]he former are pronounced by courts of equity; the latter, by courts of law.'").[3]  The Act, however, does not refer to "consent decrees," only to "consent judgment[s]."  And although it is possible to construe the word "decree" as limited to the award of equitable relief, the word "judgment" admits of no such limitation.  To the contrary, a "judgment" is "[a] court's final determination of the rights and obligations of the parties." *Judgment*, Black's Law Dictionary (10th ed. 2014).  The term may be "used in a broad sense to *include* decrees in equity," *id.* (emphasis added), but it does not under any recognized definition *exclude* monetary awards.  The pre-Tunney Act history that the Government identifies, moreover, does not challenge this settled understanding:  that history shows that the phrase "consent judgment" is capacious enough to *include* injunctive decrees, but it says nothing about whether the phrase *excludes* monetary awards.  So understood, there is no basis to conclude that the Department of Justice's practices altered the commonly understood meaning of the words Congress actually used.

---

[3]  Other definitions, however, indicate that consent "decrees" are not limited to equitable relief. "Decree" is also defined as "[a] court's final judgment" and "[a]ny court order."  *Decree*, Black's Law Dictionary (10th ed. 2014).  Moreover, a "civil-penalty order" is defined as "[a] judicial *decree* imposing some type of punishment for violating a noncriminal statute."  *Civil-penalty Order*, Black's Law Dictionary (10th ed. 2014) (emphasis added).

The Government also argues that a previously enacted provision of the Clayton Act, which like the Tunney Act appears in § 5 of the Clayton Act, shows that Congress used the phrase "consent judgment" to refer solely to settlements invoking the equitable—or injunctive—power of the courts.  As originally enacted, § 5 of the Clayton Act (now § 5(a)) provided "[t]hat a final judgment or decree" entered "in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws" could be used as "prima facie evidence" in a private suit for damages.  Pub. L. No. 63-212, § 5, 38 Stat. 730, 731 (1914) (codified at 15 U.S.C. § 16(a)).  The law, however, expressly exempted "consent judgments or decrees entered before any testimony has been taken."  *Id.*  From this, the Government draws the conclusion that, at least in 1914, Congress understood a "consent judgment or decree" to mean an order embodying the resolution of either a "criminal prosecution" or a "suit or proceeding in equity"—but not an action at law.  Dkt. 3 at 4.  Finally, the Government argues that the 1955 amendment to the "prima facie evidence" provision—which substituted "any civil . . . proceeding" for the prior reference to "any . . . proceeding in equity," Pub. L. No. 84-137, § 2, 69 Stat. 282, 283 (1955)—was merely intended to conform the law to the 1938 merger of law of equity, and was not intended to reflect any substantive change in the law.  Dkt. 3 at 4.  Thus, according to the Government, the phrase "consent judgment" should be construed in the Clayton Act as rooted in the Act's original focus on "proceedings in equity," which did not contemplate the award of monetary relief.  *Id.*

On closer inspection, however, this history, if anything, supports the opposite conclusion. The principal purpose of the 1955 amendments to the Clayton Act was to give "the United States the right to recover actual damages for injuries" that the Government itself sustains as a result of anticompetitive conduct.  S. Rep. No. 84-619, at 1 (1955), *as reprinted in* 1955 U.S.C.C.A.N.

2328, 2328.  The amendments thus added a new § 4A to the Clayton Act, which authorized the

United States to recover "actual damages" that it sustained to "its business or property by reason

of anything forbidden in the antitrust laws."  Pub. L. No. 84-137, § 1, 69 Stat. 282, 282–83

(1955) (codified at 15 U.S.C. § 15a).  When Congress did this, it also amended the exception to

the "prima facie evidence" provision in § 5 of the Clayton Act to exclude not only "consent

judgments or decrees entered before any testimony has been taken," but also "judgments or

decrees entered in actions under" the newly added "section 4A" of the Act.  *Id.* at § 2, 69 Stat. at

283.  Yet, had Congress believed that § 5's reference to "civil proceedings" was already limited

to claims seeking equitable relief, this change would have been unnecessary.  Moreover, the

amendment shows that Congress understood the phrase "judgments or decrees" to reach claims

for monetary relief.  From this, it is a small step to conclude that the reference to "consent

judgment[s]" in the Tunney Act was understood to include settlements for monetary relief.[4]

Finally, the Government contends that, when read as a whole, the Tunney Act cannot

sensibly be applied to HSR Act monetary settlements because "the procedures defined in the . . .

Act, and the factors it requires courts to consider, . . . apply only to settlements that seek

injunctive or other equitable relief."  Dkt. 3 at 9.  Most notably, in the Government's view, the

principal components of the competitive impact statement required by § 5(b), *see* 15 U.S.C.

§ 16(b), and related factors that the court must consider to determine whether a proposed consent

judgment is in the public interest have "little or no relevance" to a civil penalty.  Dkt. 3 at 10.

---

[4]  The language of the "prima facie evidence" provision also shows that Congress understood that orders concluding "criminal proceedings," including orders to pay "criminal fines," 15 U.S.C. § 1, were understood to constitute "consent judgments or decrees."  *See also* 10 A.L.R. Fed. 328 (1972) ("Although the phrase 'consent judgments or decrees' [in § 16(a)] does not normally describe criminal convictions, the lower federal courts are agreed that a judgment of conviction entered on a plea of nolo contendere in a federal antitrust prosecution is a consent decree within the meaning of the proviso . . . ." (internal footnote omitted)).

The competitive impact statement must, among other things, identify "the anticipated effects on competition of [the proposed] relief," "the remedies available to potential private plaintiffs damaged by the alleged violation in the event that [the] proposal for the consent judgment is entered," and "a description of the procedures available for modification of [the] proposal." 15 U.S.C. § 16(b). And, before entering the proposed judgment, the court must consider "the competitive impact of [the] judgment," and "the impact of entry of [the] judgment upon competition in the relevant . . . markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint." *Id.* § 16(e).

Courts, of course, "have a 'duty to construe statutes, not isolated provisions.'" *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)). Here, however, the requirements identified by the Government are not inconsistent with application of the Act to civil penalty settlements. First, the fact that certain factors are not implicated by a particular settlement—*e.g.*, that there are no procedures for modifying the settlement or that the settlement is unlikely to have any direct or readily identifiable competitive effect in the relevant markets—does not render the application of the Act to civil penalties untenable or even awkward. Indeed, the Government (in its view, voluntarily) used Tunney Act procedures to explain its first HSR Act settlement for a civil penalty, and its competitive impact statement was both perfectly coherent and wholly consistent with the purposes of the Tunney Act. *See United States v. The Costal Corp.*; Proposed Final Judgment and Competitive Impact Statement, 49 Fed. Reg. 36,454, 36,454–59 (Sept. 17, 1984).

Second, although it is true that a purely procedural violation of the HSR premerger notification requirement—that is, a failure to give notice of a merger that does not otherwise

14

violate the antitrust laws—might appear to have, at most, a limited competitive impact, the Government has consistently applied the Tunney Act to HSR Act settlements involving injunctive relief.  *See* Dkt. 3 at 13 n.4.  Yet every time the Government agrees to resolve a HSR Act claim on purely monetary terms, it necessarily agrees not to seek injunctive relief.  That decision implicates the same policy considerations as the Government's decision to seek injunctive terms.  That is, if it is appropriate to assess the impact on competition of a proposed HSR Act injunctive settlement, then it is appropriate to assess the consequences of declining to seek injunctive relief.  It is also an overstatement to suggest that purely monetary settlements will have no competitive consequences.  As the Government itself stated in its first HSR civil penalty action, "While civil penalties . . . have no competitive impact in and of themselves, the civil penalty . . . will help deter Defendant and others . . . from failing to comply with the notice and waiting requirements of the HSR Act.  Compliance with these requirements will strengthen antitrust enforcement and thereby help to maintain competitive markets."  49 Fed. Reg. at 36,456.  Thus, although the competitive impact of an HSR civil penalty settlement is an indirect one, there is no reason that the Department and the Court cannot assess how that indirect impact affects the public interest.

In summary, nothing in the structure or purposes of the Tunney Act suggests that applying it to consent judgments for civil penalties would be "'untenable in light of [the statute] as a whole,'" *King v. Burwell*, 135 S. Ct. 2485, 2495 (2015) (quoting *Dep't of Revenue of Oregon v. ACF Indus., Inc.*, 510 U.S. 332, 343 (1994)), and thus the Court finds no reason "to depart from what would otherwise be the most natural reading of the pertinent statutory phrase," *id.*  Nor is there any basis to conclude that Congress assigned anything but the plain meaning to the phrase "consent judgment" anywhere in the Clayton Act, including in the Tunney Act.  To

the contrary, the United States has itself used the phrase in just this way.  *See, e.g.*, Press Release, Fed. Trade Comm'n, *Penzoil to Pay $2.6 Million to Settle Federal Charges in Purchase of Chevron Stock*, 1994 WL 524955 (Sept. 27, 1994) (referring to "consent judgment" requiring payment of civil penalty for alleged HSR Act reporting violation).  The Court, accordingly, concludes that the statute unambiguously applies to all antitrust "consent judgments," including those seeking purely monetary relief.

## B.  The Legislative History

As the Government correctly notes, much of the legislative history of the Tunney Act suggests that Congress's principle concern was with consent decrees embodying equitable relief. As discussed above, the history of the Tunney Act can be traced back to the 1959 Report of the Antitrust Subcommittee of the House Committee on the Judiciary.  That Report discusses a series of specific antitrust settlements, all of which involved the use of consent decrees to restrain specific conduct.  1959 Report at 35–39, 171–72.  It begins, moreover, by discussing the Justice Department's authority to enter negotiated settlements in "equity proceedings that have been instituted by the Attorney General to enjoin violations of the antitrust laws," *id.* at 1, and it ends by discussing potential reforms to the "consent decree" procedures employed by the Department of Justice, *id.* at 301–05.  Although some of the Subcommittee's concerns were directed generally at the enforcement of the antitrust laws—such as ensuring that the use of settlements did not impede the development of judicial precedents interpreting the antitrust laws and that those who violate the antitrust laws cannot avoid "unfavorable publicity" through amicable settlements—others were directed more specifically at injunctive decrees—such as ensuring that competitors who are affected by the settlement receive notice and an opportunity to be heard.  *Id.* at 303–04.

Similarly, the Justice Department's 1961 "Consent Judgment Policy" was most clearly directed at antitrust settlements involving injunctive relief.  The policy was adopted in response to the 1959 Report, which was itself prompted by concerns about inadequate injunctive decrees. The policy, moreover, applied only to settlements in actions "to prevent or restrain violations" of the antitrust laws, 28 C.F.R. § 50.1(a) (1970), and, as noted above, a nearly identical phrase appears in § 4 of the Sherman Act and § 15 of the Clayton Act, and, in those contexts, is directed at "proceedings in equity."  15 U.S.C. §§ 4, 25.  And, finally, the 1961 policy was designed to "afford[] persons (natural or corporate) *who may be affected* by" the settlement an opportunity to be heard.  28 C.F.R. § 50.1(a) (1970) (emphasis added).  Although it is conceivable that a purely monetary settlement might affect third parties, it seems most likely that the policy was concerned with the effect that an injunctive settlement might have on those who were not parties to the litigation or negotiation.

This focus on equitable decrees, as opposed to monetary settlements, carried through to Congress's consideration of the Tunney Act itself.  Passage of the Act was most immediately prompted by congressional concern about settlement of the ITT antitrust case, where ITT was required to give up certain "holdings, but was allowed to retain the Hartford Fire Insurance Co., its most profitable subsidiary and most liquid asset."  119 Cong. Rec. at 24,598 (statement of Sen. Tunney).  Other examples of controversial settlements included the 1941 Atlantic Refining Co. case, where the "original complaint sought sweeping divestitures in the oil industry," but "the eventual consent decree only resulted in the divestment of 2,500 [unprofitable] Sinclair service stations in 14 sparsely populated Mid-continent States;" the 1956 ATT-Western Electric case, where ATT was allowed "to retain its manufacturing monopoly notwithstanding overwhelming evidence of improprieties;" the 1966 Von's Grocery Store case, where Von

17

merely "jettisoned its 40 least profitable outlets;" the 1969 "smog case,"  where the automobile

industry was not required to "undo its past damage;" and the El Paso case, where the Supreme

Court "accused the Antitrust Division of 'knuckling under' to the El Paso Natural Gas Co."  *Id.*

Like the examples given in the 1959 House Report, all of these examples involved the asserted

inadequacy of injunctive decrees.

Given this background, the Court does not doubt that Congress was spurred to act by its

perception that the Justice Department had repeatedly settled antitrust cases for injunctive

decrees that were less demanding than Congress believed appropriate.  That, however, does not

resolve the issue for several reasons.  First, the most obvious reason that Congress focused on

consent decrees is that, at the time the Tunney Act was enacted, consent decrees constituted the

overwhelming bulk of the Department's enforcement activity—from "1955 to 1967, 81 percent

of all antitrust judgments were represented by consent decrees."  119 Cong. Rec. at 3,455

(statement of Sen. Gurney); *see also* 118 Cong. Rec. at 31,674 (statement of Sen. Tunney)

(approximately 80 percent of civil antitrust suits settled through "consent decrees" requiring the

defendant to "modify its conduct").  Indeed, the Government has identified only two statutes that

authorize the imposition of monetary penalties in an antitrust action—the FTCA, which permits

the United States to seek monetary penalties, as well as injunctive relief, where a party to an FTC

order violates that order, and the HSR Act, which was not enacted until two years after the

Tunney Act.  15 U.S.C. §§ 18a(g)(1), 21(*l*); *see also id.* § 15a (damages suits by United States).

It is thus unremarkable that there was little focus on purely monetary relief at the time the

Tunney Act was enacted.

Second, although not the principal focus of the legislation, there is some evidence that

Congress was concerned with more than just injunctive decrees.  In discussing the ITT

settlement, for example, Senator Tunney expressed dismay that the company was not required to "disgorge the profits made between acquisition and divestiture, a retention which can only offer incentives to others to strive for similar short-run profit taking." 119 Cong. Rec. at 24,598 (statement of Sen. Tunney). Although disgorgement is often considered an equitable remedy, that label is not relevant for present purposes. What matters is the fact that Congress was concerned with the failure of the Justice Department to pursue a monetary remedy that would not have had a direct effect on competition but would have created "incentives" for others to comply with the antitrust laws. Although perhaps a step further removed, the same is true here. The imposition of HSR Act penalties, in the words of the Justice Department, deter violations of the pre-merger notification requirements and thus "strengthen antitrust enforcement and thereby help to maintain competitive markets." 49 Fed. Reg. at 36,456. As the Department has further explained:

> Before the HSR Act was enacted, the DOJ and the FTC were often forced to investigate anticompetitive mergers that had already been consummated without public notice. In those situations, the agencies' only recourse was to sue to unwind the parties' merger, and the merged firm often delayed the litigation so that years elapsed before adjudication and attempted relief. During this extended time, the loss of competition continued to harm consumers, and if the court ultimately found that the merger was illegal, effective relief was often impossible to achieve.

79 Fed. Reg. 70,555, 70,561 (Nov. 26, 2014). That explanation of the purpose of the HSR Act parallels the concern about disgorgement discussed in the Tunney Act legislative history.

Finally, although not every policy concern discussed in the legislative history applies to HSR Act monetary settlements, a number do. Congress, to be sure, recognized that enforcement actions under the Sherman Act can have a substantial effect on the public and the defendant's competitors. The Government's choice to settle a case, rather than to litigate it to judgment, can deprive third parties of the benefit of the collateral estoppel benefits of a litigated judgment, *see*

15 U.S.C. § 16(a), and "a bad or inadequate consent decree may as a practical matter foreclose further review of a defendant's practices."  118 Cong. Rec. at 31,674 (statement of Sen. Tunney). Those concerns admittedly have little to do with a monetary settlement of an HSR Act claim. But, Congress also recognized that "the public's interest in deterrence of future antitrust violations by the defendant and by other potential defendants may be affected profoundly by the willingness of the Justice Department to settle cases and the price exacted for such settlements." *Id.*  To the extent that compliance with the HSR Act "help[s] to maintain competitive markets," as the Department has professed, 49 Fed. Reg. at 36,456, the public has an interest in ensuring that HSR Act settlements exact an appropriate price.  Following in the wake of the ITT settlement and the related scandal, moreover, Congress was concerned with both transparency and the fact that antitrust settlements may invite intensive lobbying, because "the stakes are high" for "those who exercise the greatest corporate influence."  118 Cong. Rec. at 31,676 (statement of Sen. Tunney).  It thus concluded that "it is particularly important to assure some measure of public scrutiny of the exercise of that influence."  *Id.*  Although that rationale may apply most acutely in cases where the Government seeks to block large mergers or to require divesture of substantial interests, the principle applies broadly enough to include HSR Act monetary penalties.

For present purposes, the Court need not—and does not—conclude that Congress was focused on purely monetary settlements.  Because the plain language of the Tunney Act reaches all "consent judgments"—whether for injunctive or monetary relief—the questions are whether "reliance on [the literal] language would defeat the plain purpose of the statute," *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983), and whether the context in which Congress employed that language makes evident a "meaning—or ambiguity— " not otherwise evident from the text,

*King*, 135 S. Ct. at 2489.  For the reasons explained above, the answer to both of these question

is "no."  To the contrary, inclusion of proposed monetary judgments within the scope of the Act

serves its objectives of increasing transparency and accountability in the settlement of antitrust

cases and ensuring that antitrust settlements "exact a price" sufficient to deter future violations of

the antitrust laws.

## C.  Practice and Congressional Ratification

The Government further contends that district courts have a longstanding practice of

exempting consent judgments for civil penalties from Tunney Act procedures and that Congress

has implicitly ratified this practice.  Dkt. 3 at 12–15.  To be sure, district courts have on many

occasions since the passage of the Act entered civil penalty consent judgments without first

applying Tunney Act procedures, *see* Dkt. 3 at 21–26 (table collecting 47 HSR entries of

judgment); *see also id.* at 35 (Exh. 2) (entry of judgment for civil penalty under 15 U.S.C.

§ 21(*l*)), but these unpublished cases provide, at best, limited support for the Government's

construction of the Act.

Neither the Government nor this Court has identified any cases analyzing the issue in any

depth, or any Court of Appeals decision addressing it at all.  *United States v. Computer*

*Associates International, Inc.*, provides the longest discussion of the matter.  *See* No. 01-2062,

2002 WL 31961456, at *9 (D.D.C. Nov. 20, 2002).  The final judgment entered by the district

court in that case, however, simply stated:  "The United States does not believe that the payment

of civil penalties under the HSR Act is subject to the [APPA].  Consequently, the civil penalties

component of the proposed Final Judgment is not open to public comment."  *Id.*  A footnote then

explained:

> Obtaining civil penalties in a consent judgment is not the type of "consent
> judgment" Congress had in mind when it passed the APPA.  Thus, in consent

settlements seeking both equitable relief and civil penalties, courts have not required use of APPA procedures with respect to the civil penalty component of the proposed final judgment.  Moreover, courts in this district have consistently entered consent judgments for civil penalties under the HSR Act without employing APPA procedures.

*Id.* at *9 n.1 (internal citations omitted).

In the absence of a more complete analysis, such pronouncements are of only limited persuasive value.  Indeed, the Government has not identified a single case in which the issue of the Tunney Act's application to civil penalties was substantively briefed; rather, it points only to cases in which it "notified" the court of its interpretation of the Act—in the manner it did here— by including a short statement regarding its position in its motion for entry of judgment.  Dkt. 3 at 16 & n.9, 21–26.  Accordingly, the district courts' practice of entering consent judgments for civil penalties without applying Tunney Act procedures says little, if anything, about whether that practice is consistent with the statute.

Nor is the Court persuaded that Congress has implicitly ratified the practice, as the Government contends.  Dkt. 3 at 12–15.  Under the ratification doctrine, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  This rule applies when Congress re-enacts a provision in the face of a "consensus [as to its interpretation] so broad and unquestioned that [the Court] must presume Congress knew of and endorsed it."  *Jama v. ICE*, 543 U.S. 335, 349 (2005).  Here, there is no reason to conclude that Congress has ratified an interpretation of the Tunney Act that excludes purely monetary settlements.

In support of its ratification argument, the Government points to the 2004 amendments to the Tunney Act, *see* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L.

No. 108-237, § 221(b)(2), 118 Stat. 661, 668–69 (2004) (codified at 15 U.S.C. § 16)—the only amendments that Congress has made to the Act.  Those amendments: (1) made it mandatory, rather than permissible, for courts to consider all of the "public interest determination" factors enumerated in § 5(e); (2) revised some of the § 5(e) enumerated factors and added others; (3) permitted district courts to authorize a more cost-effective method of disseminating public comments than publication in the Federal Register under § 5(d); and (4) specified which agents of the defendant are subject to the lobbying disclosure requirements of § 5(g).  *Id.*  The amendments also included legislative findings indicating that Congress's principle purpose was to overrule the D.C. Circuit's decisions in *United States v. Microsoft*, 56 F.3d 1448, 1462 (D.C. Cir. 1995), and *Mass. School of Law at Andover, Inc. v. United States*, 118 F.3d 776, 783 (D.C. Cir. 1997), both of which held that a proposed consent judgment should be rejected only if it would make "a mockery of judicial power."  *See* Pub. L. No. 108-237, § 221(a), 118 Stat. at 668; *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 11–14 (D.D.C. 2007).

Nothing contained in those amendments or Congress's consideration of the legislation approaches the type of showing required to find an implicit ratification of a judicial or administrative interpretation of a pre-existing statute.  First, and foremost, Congress did not re-enact the Tunney Act as a whole and did not re-enact the provision containing the language at issue here.  That language—"any proposal for a consent judgment submitted by the United States"—appears in § 5(b) of the Clayton Act.  The 1994 amendments, however, did not touch § 5(b), but, rather, added language to § 5(d) and § 5(g) and added and deleted language in § 5(e).  Pub. L. No. 108-237, § 221(b)(2), 118 Stat. 661, 668–69 (2004).  Thus, Congress did not "re-enact . . . without change" the statutory provision on which the Government places an interpretive gloss.  *Lorillard*, 434 U.S. at 580.  *Cf. Jama*, 543 U.S. at 349; *NLRB v. Gullett Gin*

*Co.*, 340 U.S. 337, 366 (1951); *Nat'l Lead Co. v. United States*, 252 U.S. 140, 146–47 (1920); *In re North*, 50 F.3d 42, 45 (D.C. Cir. 1995).

Nor does the Government point to any evidence that Congress gave any consideration to the meaning of "consent judgment" in § 5(b) or that it was even aware of the practice of exempting consent judgments seeking civil penalties from Tunney Act review. Although courts often presume that Congress is "aware of an administrative or judicial interpretation of a statute and . . . adopt[s] that interpretation when it re-enacts a statute without change," that presumption turns in significant part on the condition that the pre-existing interpretation is one that "affects the new statute." *Lorillard*, 434 U.S. at 580–81. The notion is that Congress necessarily legislates against a backdrop of established law. Courts assume that Congress is aware of that law and, absent evidence to the contrary, that it understands how new legislation fits within the existing framework. It is an altogether different matter, however, to make the unrealistic assumption that Congress is aware of—and intends to ratify—unreported district court orders and occasional Federal Register notices[5] that are unrelated to the specific provisions it is amending or to the substance of the changes it is making. *See Jama*, 543 U.S. at 351 (rejecting contention that two Court of Appeals decisions, "one of which was only a two-sentence *per curiam*," amounted to a "judicial consensus").

---

[5]  In addition to the unpublished entries of judgment by district courts discussed *supra*, the Government has periodically stated its position in Federal Register notices regarding mixed consent judgments that seek both equitable relief and civil penalties. *See, e.g.*, 44 Fed. Reg. 41,579, 41,583 (July 17, 1979) ("[W]e do not believe that under the A.P.P.A. the penalty aspect of this case is open to public objection."). The Government also explained its view that the Tunney Act is inapplicable to HSR Act settlements for civil penalties in a footnote in the Federal Register in conjunction with its first HSR Act penalty case in 1984. 49 Fed. Reg. at 36,455 n.1; *see also* Dkt. 3 at 17–18.

Finally, application of the ratification doctrine to the 2004 amendments is particularly out of place here, since those amendments sought to ensure robust judicial review of "consent judgments."  *See SBC Commc'ns, Inc.*, 489 F. Supp. 2d at 11–14.  The Government's argument, in contrast, would contradict the plain terms of the Tunney Act, and it would do so in the absence of any congressional acknowledgment or evidence that the issue of purely monetary antitrust settlements was subject to a moment's consideration or debate.  The ratification doctrine is a tool for discerning congressional intent—not a means of creating it.  The Court, accordingly, rejects the Government's contention that Congress has adopted through silence a narrowing and atextual interpretation of "consent judgment."

### III.  CONCLUSION

For the forgoing reasons, the Government's Motion for Entry of Final Judgment (Dkt. 1-4) is **DENIED** without prejudice.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: February 12, 2016